[No. 18218.   Department Two.   November 20, 1923.]

## In the Matter of the Estate of CHARLES DAWSON, Deceased.

## EDNA M. ALFRED, *Appellant*, v. THE BANK OF CALIFORNIA, *as Administrator, Respondent*.[1]

INSANE PERSONS (4)—MENTAL CAPACITY—EVIDENCE—SUFFICIENCY. Findings that the donor of a ring was at the time insane and incompetent to make the gift, are sustained where it appears that he was at the time suffering from paresis, for a week or two he had irrational periods and was plainly fully unbalanced and incompetent several times shortly before, and within six hours after he had given the ring he was thoroughly unbalanced and the next day wanted it back.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered April 28, 1923, in probate, in favor of the administrator, determining its title to personal property.   Affirmed.

*Burkey, O'Brien & Burkey,* for appellant.

*Raymond J. McMillan* and *Ernest K. Murray,* for respondent.

BRIDGES, J.—The ultimate question here is the mental capacity of Charles Dawson on February 6, 1921, at which time he gave to the appellant a ring valued at some $600.   The judgment below was against the appellant.

Inasmuch as the respondent has raised objections to the appellant's abstract of the testimony, we have been to the trouble of reading the statement of facts. We will here undertake to give only the more important and outstanding facts, as shown by the testimony.   For the most part, the testimony is limited to the actions of Mr. Dawson at the time of the giving of the ring, and for

[1]Reported in 220 Pac. 764.

some two or three weeks immediately preceding that time.

He had resided in the city of Tacoma a good many years, and for much of that time held the position of superintendent of an important factory. In 1918, his wife died, not leaving any children. He had accumulated a fortune of some $40,000. He had various kinfolk living in Tacoma—among the rest, certain brothers and nieces; and the appellant who is a married woman, was one of the nieces. A few days prior to giving the ring, he was in consultation with his attorney with a view of having his will drawn. At that time, he stated that he was going to take a trip to California and that he might also take a trip around the world. A careful reading of the testimony of the attorney impresses us with the fact, not that Mr. Dawson was insane, but that his mind was not clear. In his talk concerning what disposition he desired to make of his property, his thoughts were rambling and covered many subjects foreign to that under investigation.

About the same time, he took dinner at his brother's home. Nothing very unusual occurred at that time. He left for his own home about ten o'clock in the evening, and at about midnight he called his brother on the telephone and asked the latter to come to his house. This request was complied with. The testimony shows that he was very nervous, and was talking irrationally on many subjects; and, among others, was trying to demonstrate to his brother that, by mere use of the mind, he could cause the playing of a phonograph to stop. After an hour or two, his condition seemed to be better.

Within a day or two of that time, he desired to take some flowers to the grave of his deceased wife. He drove his own automobile thither, taking with him the flowers and a couple of ladies who were related to him.

His conversation and his actions during that trip appeared to be entirely rational. From the cemetery, he and his guests went to the country club for lunch, and while there his conduct and conversation were as usual.

Shortly before this last occurrence, the employees of the factory of which he was superintendent complained about him and his eccentric actions and he was discharged because thereof; and as a result, he became very angry and threatened to do violence to his former employer. On two or three other occasions, some of his friends and relatives were with him and they described his actions as entirely natural and rational. A day or two before the ring was given, he talked to the local agent of the Premier automobile with a view of buying a roadster, and he and the agent went together to Seattle, where they found the machine (an expensive one) that he liked and he agreed to buy it and ordered installed on it many accessories, a part of which do not exist. He refused to turn in his old machine in part payment of the new, saying that he wanted to put it in the Ferry Museum. At about the same time, he called on his tailor and ordered a $300 dress suit, when the most expensive dress suit in the shop was $150. He told the tailor he would have the $300 check framed and it could be hung on the wall of the shop.

He was invited to the appellant's house for dinner at about 2 or 3 o'clock in the afternoon. Several persons were present. The actions and conversation of Mr. Dawson seemed to be rational and as usual. Just before they were to leave the dinner table, in the presence of all the guests, he spoke to the appellant, saying that he had a ring which he wanted to give her and that he had intended for some while to give it to her, and asked her to hold out her finger that he might wish the ring to her, saying that he hoped she would keep it. He re-

mained for an hour or two after dinner, and appeared to those present to be rational. During this time, he offered to loan the husband of appellant $500, which loan was refused. The ring was one which his deceased wife had worn, and from the time of her death in 1918, he had, on a number of occasions, told different persons that he intended to give the ring to the appellant. Notwithstanding this, at one time he offered to give the ring to another niece, who refused it.

About midnight of the same day that he gave the ring to the appellant, he called the chief of police on the telephone, saying to him that some persons were trying to do him bodily harm and asked protection. The police visited his home and found him in a very excited and mentally unbalanced condition, and took him to the jail and called a physician. The physician found him to be mentally unbalanced, and after a hasty inquiry, concluded that he might be suffering from paresis. The physician took his patient to Dr. Snokes' sanitarium, where, after a conference between the two physicians, it was again agreed that the patient was probably suffering from paresis. Three or four days thereafter, a blood test was made and it turned out that the prior diagnosis was correct. The patient died at the sanitarium some fifteen months after being taken there. While there, his condition grew worse from month to month. He seemed to have rational moments and even hours, but most of the time he was more or less completely irrational. The morning after he was taken to the sanitarium, he directed that the ring (together with other things) be obtained and kept in a safe place.

The testimony of the physicians shows that paresis is generally a creeping disease, and comes on very gradually; there are, however, exceptional cases where the mind seems to give way suddenly. Generally one so

affected is grandiose, and wants to give away much that he has.  Two of the physicians who gave testimony testified that, in their opinion, Mr. Dawson was not mentally competent to give the ring to the appellant. Another physician (called by appellant) who testified— largely upon hypothetical questions—leaves us with the impression that he was in doubt whether Mr. Dawson was mentally competent at the time the ring was given.  There is much more less important testimony tending to show the sanity or insanity of the deceased, but we will not here detail it.

In giving the ring, the deceased was apparently carrying out an intention which he had long before, and while there was no question about his mental capacity, formed.  But that in itself is insufficient if, as a matter of fact, he was incompetent at the time he actually made the gift.  The most that can be said for such testimony is that it is persuasive proof of the assertion that, at the time the gift was made, the donor was rational and knew what he was doing.  The testimony leaves no doubt, however, that, during the week or two immediately preceding the time of the giving of the ring, the deceased was at times fully unbalanced and incompetent to make a gift or transact any business.

The disease is one which comes on gradually; it makes the person affected think that he is rich and powerful; he wants to make gifts; the deceased was plainly incompetent at several times shortly before he gave appellant the ring; within six hours after that act, he was thoroughly unbalanced; within a day after he had given the ring to appellant, he wanted it back. These things and others, when the nature of the disease and its characteristics are considered, show that Mr Dawson's mind must have been greatly affected and impaired, even in doing those things which to the ordi-

nary observer seemed to be natural, reasonable and rational.

On questions of this character, courts should pay due respect to the experience and learning of physicians. Their testimony in this case strongly impresses us with the idea that their belief was that, at the time the deceased gave the ring to the appellant, he was not mentally competent to make a gift. While this may be considered a close case, yet, under the evidence, we do not feel disposed to find the facts contrary to the conclusions of the trial court, who saw and heard the witnesses.

We think appellant's objections to the admission of testimony are not well founded. But, in any event, if it be not considered, the result would be the same.

The conclusion to which we have come is no reflection whatsoever upon the appellant. The testimony makes it plain that she has at all times acted fairly and honestly in connection with this matter.

The judgment is affirmed.

MAIN, C. J., FULLERTON, MITCHELL, and PEMBERTON, JJ., concur.